**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **SECURENET SOLUTIONS GROUP, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FLOCK GROUP INC. d/b/a FLOCK SAFETY,**<br><br>**Defendant.** | : | **Case No. ________________** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff SecureNet Solutions Group, LLC (the "Plaintiff" or "SecureNet") files this Complaint for patent infringement against Defendant Flock Group Inc. d/b/a Flock Safety (the "Defendant" or "Flock"), and by its attorneys, hereby alleges as follows:

## I. Introduction

1. This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 et seq. Plaintiff sues Defendnat for patent infringement via its unauthorized manufacture, use, offers to sell, sale, or importation of Plaintiff's patented inventions within and into the United States, including video analytics and security solutions. Flock offers and sells technologies for profit that are protected by, and infringe upon, patents owned by SecureNet, including U.S. Patent No. 12,375,342 (claims 12, 17, and 20), U.S. Patent No. 11,323,314 (claims 13 and 21), U.S. Patent No. 9,344,616 (claim 48), U.S. Patent No. 11,929,870 (claims 1, 12, and 20), U.S. Patent No. 9,619,984 (claim 10), U.S. Patent No. 10,587,460 (claims

11, 13, and 14), and U.S. Patent No. 10,862,744 (claims 16 and 26) (collectively, the "Asserted Patents").[1]

2. Flock's infringing products include, but are not limited to, Flock Safety's Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS® Real-Time Crime Center platform, Enhanced LPR software, Flock Safety Platform, and Raven® audio detection device (collectively, the "Flock System") and related software, services, and hardware configurations used to deploy those products as an integrated system (collectively, the "Accused Products").

## II. Parties

3. Plaintiff SecureNet Solutions Group, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 3427 Bannerman Road, Suite D208, Tallahassee, FL 32312.

4. On information and belief, Defendant Flock Group Inc. is a Delaware corporation with its principal place of business located at 1170 Howell Mill Road NW, Suite 210, Atlanta, Georgia 30318.

## III. Jurisdiction and Venue

5. This action arises under the Patent Laws of the United States, Title 35 of the United States Code. The Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

---

[1] U.S. Patent No. 12,375,342 ("the '342 patent") is attached as **Exhibit A**, U.S. Patent No. 11,323,314 ("the '314 patent") is attached as **Exhibit B**, U.S. Patent No. 9,344,616 ("the '616 patent") is attached as **Exhibit C**, U.S. Patent No. 11,929,870 ("the '870 patent") is attached as **Exhibit D**, U.S. Patent No. 9,619,984 ("the '984 patent") is attached as **Exhibit E**, U.S. Patent No. 10,587,460 ("the '460 patent") is attached as **Exhibit F**, and U.S. Patent No. 10,862,744 ("the '744 patent") is attached as **Exhibit G**.

6. Venue is appropriate in any judicial district, including this District, pursuant to 28 U.S.C. § 1400(b) because the Defendant resides here.

7. On information and belief, Flock has committed acts of direct and/or indirect infringement in this District, including but not limited to ALPR Camera Deployments including automated license plate recognition cameras, gunshot detection, and FlockOS software. Moreover, on information and belief, Flock deploys its cameras, hardware installations, and network infrastructure for various law enforcement agencies, municipalities, homeowners' associations, and commercial properties across Delaware communities.

## IV. The Background of the Asserted Patents

8. The claims of the Asserted Patents address a need specific to computerized security systems.

9. The inventors conceived the inventions after a three-day workshop with CLEMIS, the IT Department for the Oakland County, Michigan confederation of police departments, the largest confederation of police departments in the country. During the workshop, the police identified major problems with known police IT systems. In 2007, the priority date for the Asserted Patents, smart surveillance systems were gaining commercial adoption and replacing traditional security systems, creating challenges in (1) large-scale data analysis and (2) data management.

> *The increasing need for sophisticated surveillance systems and the move to digital surveillance infrastructure has transformed surveillance into* ***a large scale data analysis and management challenge.*** *Smart surveillance systems use automatic image understanding techniques to extract information from the surveillance data. While the majority of the research and commercial systems have focused on the information extraction aspect of the challenge,* ***very few systems have explored the use of extracted information in the search, retrieval, data management and investigation context****.*

*See, e.g.,* Lisa Brown, Arun Hampapur, Jonathan Connell, Max Lu, Andrew Senior, Chiao-Fe Shu, Yingli Tian, IBM Smart Surveillance System (S3): *An open and extensible architecture for smart*

*video surveillance*, IBM T.J. Watson Research Center, Proceedings of the IEEE Conference on Advanced Video and Signal Based Surveillance, AVSS 2005, Sept. 15-16, 2005 (italics in original) (emphasis added).

10. By the priority date, prior-art smart surveillance systems had gained commercial adoption and improved on security guards' viewing of "dumb" terminals in closed-circuit television ("CCTV") systems. Automatic data extraction and computer processing reduced reliance on a guard's visual perception of the display, pen-and-paper records, and mental review of the surroundings as the basis for issuing an alert. Those systems were faster and more effective than manual monitoring.

11. Then-existing smart-surveillance software, however, could not handle the resulting volume of information. Too many inputs arrived too quickly and in incompatible formats to distinguish routine from suspicious activity, producing false alarms and missed detections that undermined reliability.

12. SecureNet's inventions address the volume of data produced by proliferating cameras, sensors, and networked monitoring devices. They do not merely add computing power or speed, which was already present in the prior art smart surveillance systems. Nor do they merely automate what a security guard could accomplish with pen and paper. Instead, they recite a specific, discrete implementation of event analysis, normalization, attribute weighting, correlation across time and space, rule evaluation against enriched event records, and hierarchical storage management, configured to operate together in a customizable architecture, that fundamentally changes how the surveillance system processes and evaluates data, overriding the routine and conventional sequence of events by detecting anomalies through enriched, weighted, and correlated event records that no individual observation would reveal.

13. The probabilistic, machine-executed weighting described in the Asserted Patents is fundamentally different from the subjective human "weighing" of human perception of "dumb" CCTV monitors.

14. The Specification describes systems that can override and correct human judgment, demonstrating that the system improves the functioning of the technology itself, not merely the human process of monitoring. Specifically, the inventions identify critical events not through what can be observed on a "dumb" CCTV terminal, and for example, subjectively ***weighing*** the quality of a camera feed in a monitor but through machine-executed probabilistic ***weighting*** and correlation of heterogeneous sensor data based on attribute data *about the sensor* that is not discernible to the human eye, nor readily available to a security guard. Such correlations could effectively connect crime-related events to specific sensor data, other legacy system data, 911 calls, anonymous tips, and video records, reducing errors and false positives via a particular computerized process as provided in the Asserted Claims.

## V. The Inventions are Described in the Specification of the Asserted Patents and Included in Claim Limitations

40. A high-level depiction of one embodiment of the invention is illustrated in Figure 1 the '616 patent:[2]

[2] For ease of reference, all citations are to the '616 patent. All Asserted Patents are related and have the same specification.

Fig. 1




'616 patent, Fig. 1.

41. In this embodiment, various types of security-related data are collected from sources including video cameras and other sensory devices, a video tip system, a card access system, a personnel system, and a vehicle information module. '616 patent at 5:31-6:38. As depicted in Figure 1, data flows from an analog camera (102) through DVR (103) to video analytics modules, which process the data to identify primitive events. Primitive events are "atomic, indivisible event[s] from any subsystem," structured for storage as metadata in an events database, including people entering a designated area, a vehicle driving the wrong way in a designated lane, a package left behind in an area, a person screaming, glass breaking, or a gunshot. '616 patent at 4:4-11. A primitive event may be automatically "detected" by image- or audio-processing algorithms running on a sensor, edge device, specialty video analytics device capable of detecting a face, or analytics server; extracted from analog data and structured (such as analog camera 102); or entered by a person and digitized or otherwise processed into structured event data.

Accordingly, the detection is a system operation, not a human mental process. The architecture therefore converts both automated detections and human input into event data that the claimed components can normalize, weight, store, correlate, and act upon.

42. The primitive events are normalized by the normalization engine. ‘616 patent at 6:21-28. The normalization engine normalizes primitive events into a “normalized event 115,” a “standardized format the system can recognize.” ‘616 patent at 6:50-53. The Specification provides that “each type of sensory device may have its own normalization engine” and that “[a]lternatively, one normalization engine as shown in FIG. 1 may have multiple modules for each type of sensory device.” ‘616 patent at 6:53-55, 6:61-63. Normalization is not analogous to writing entries in a logbook. The engine standardizes protocols and signals from heterogeneous sources, including cameras using different codecs, sensors transmitting over different IP protocols, and legacy systems using proprietary data formats, before the data reaches a human monitor.

43. In the described embodiment, “[n]ormalized events 115 are placed in event queue 116 for processing by correlation engine 117.” ‘616 patent at 7:1-3. The basic function of the correlation engine is to “correlate[] two or more primitive events, combinations of primitive events and compound events, and combinations of compound events.” ‘616 patent at 7:15-17. Figure 2 shows how the correlation engine works in one embodiment of the invention:




'616 patent at Fig. 2 (rotated).

44. The correlation engine receives normalized events from the normalization engine. '616 patent at 7:53-57. These normalized events are then filtered by a privacy filter, which applies a set of privacy rules defined by a system administrator. '616 patent at 7:58-60. For example, a privacy rule may instruct the system to ignore all primitive events between certain time periods, or to disregard other categories of data. '616 patent at 7:64-8:6. This is a configurable, system-level restriction on what data proceeds to correlation; it is not a human guard deciding after the fact what he/she happens to consider important on a monitor.

45. After privacy filtering, the correlation engine applies a business filter using administrator-defined business rules. '616 patent at 8:14-18. The filter eliminates unnecessary false alarms by disregarding events when they are not significant based on normal business processes. '616 patent at 8:26-28. In a data-center security system, for example, it may ignore primitive events during scheduled service hours. '616 patent at 8:22-26. The rules tailor the system

to its deployment context, such as a campus, port facility, data center, or border environment, and define a particular implementation of event processing rather than a generic instruction to analyze surveillance data.

46. After the correlation engine has filtered primitive events based on the privacy and business rules, it evaluates the remaining primitive events for the presence of "compound events", events that are composed of one or more primitive events. '616 patent at 4:36-38; 8:29-32. An example of a compound event is tailgating (i.e., where two or more persons enter a designated area as detected on the video data using a person-counting algorithm, when only one corresponding swipe/access card is detected by the legacy access control system). '616 patent at 8:34-38. Compound events "may include primitive events from one sensor, from two or more sensors, or even from two disparate types of sensors." '616 patent at 8:40-43.

47. Next, the correlation engine uses a correlation module 210 to correlate. '616 patent at 8:44-46. Correlation is customizable. The Specification permits administrators to tailor correlation parameters to deployment environments and compound events across geographical space. '616 patent at 8:38-43. For example, it allows administrators to define relevant event types and spatial and temporal relationships, such as those relevant to a college campus or a data center. Correlation module 210 correlates primitive and compound events across geographical space, such as multiple tailgating events or loitering vehicles in different parts of a facility or campus. It also correlates events across time by comparing current events with past events. '616 patent at 8:44-61. Examples include detecting the same individual allowing another person to tailgate at different times or the same person loitering or being stopped multiple times by security.

48. The event correlation modules' 210 and 212 correlation of primitive and/or compound events over space and/or time produces a new data type: correlated events. '616 patent at 4:42-44.

49. As shown in Figure 1, the correlation engine 117 receives input from events database 118 and configuration database 119 that include sensor attributes and rules and it outputs to alert/action engine. '616 patent at 7:10-15.

Fig. 1




50. Prior art systems did not account for differences in data quality among heterogeneous sensors. A system might treat data from an old analogue video camera the same as data from a newer digital video camera. This problem could thwart the detection of threats. For example, if the analogue video data were sufficiently imprecise relative to the digital video data, the system would have no way of accounting for the discrepancy and, in considering the data from both sources simultaneously, may fail to detect the threat. The Asserted Patents address this

problem by weighting the "attribute data" of the sensors; for example, the system can assign greater weight to data from the more reliable digital camera.

51. Attribute data includes "attributes," which are attributes of the sensory devices or the sensory data, and their associated weights, or weight functions which are probabilistic weights attached to data generated by the devices. '616 patent at 4:59-62 (identifying the need for a method that "weights input data from disparate systems to lower false alarm rates and to filter out unwanted, spurious, or intentionally distracting information" 2:9-13).

52. The Specification teaches that these weights are customizable. '616 patent at 26:14-32 (describing the customization of weights, including how weight functions may be tailored to specific deployment environments). A system administrator may enter and customize attribute data for each camera, including historical evidence that a camera is susceptible to tampering or that a higher-resolution camera warrants greater weight for face or license-plate recognition. For example, an attribute may be the device's age, with an associated weight function that decreases with age.

53. Law enforcement officers and security guards generally lack sensor attribute data, including a sensor's maintenance history and the reliability of the bandwidth or power supplied to it. They do not typically use that data to weight primitive events.

54. For example, the claimed systems can detect that bandwidth delay from a remote camera is degrading image quality, reduce the weight assigned to events from that camera, and avoid a false alert that a guard unaware of the delay might trigger. The system accounts for sensor-health metrics, including age, maintenance history, power level, and network latency, and automatically and heuristically adjusts event weightings which represents a capability that operates

independently of, and in some cases contrary to, human judgment. This is a type of improvement in computer functionality, not merely improvement in the human task the computer assists.

55. An administrator may input or customize attribute data, such as reliability data for a camera in a high-wind area ('616 patent at 26:33-44). The system incorporates that input into a probabilistic, vector-based, rule-based, or other machine-implemented weighting approach and applies it continuously across sensors and event types. The customization supports machine-to-machine validation; it does not convert the system into a manual human process. The concreteness of the claimed invention lies in the automated, algorithmic application of those weights across the sensor network in real time, using a customizable architecture that can be adapted to the risks, sensors, rules, thresholds, and alert recipients of the deployment environment.

56. As shown in Figure 2, the correlation engine 200 operates as a computerized loop that creates and stores enriched event records in events database 118.

***Fig. 2***




57. Normalized primitive events enter the correlation engine; privacy and business filters apply administrator-defined rules; compound event detection module 208 identifies compound events; event correlation modules 210 and 212 correlate primitive and compound events across space and time; and the resulting compound and correlated events are written back into events database 118.

Rule evaluation module 214 then evaluates rules from rules database 216 against those enriched records, including correlated events weighted by attribute data, and uses the results to drive the alert/action engine. '616 patent at 8:63-9:2. The rule evaluation therefore operates on an enriched event database. When the correlation engine writes compound and correlated events back into events database 118, it creates distinct records: the events table (Table 3) stores correlated events with unique entry identifiers, event-type codes, timestamps, durations, and source-device references. A correlated or compound event, such as MDParameterID=12 for tailgating, is distinct from the underlying primitive events, person detected and swipe card read, from which it was derived. It carries its own absolute value from Table 2, weighted attribute data from Table 4, and temporal and spatial metadata computed by the correlation engine and absent from the raw sensor inputs. '616 patent at 8:63-67; 21:18-23; 22:1-20; Table 3.

58. Figure 2's loop feeds compound and correlated events, weighted by attribute data, back into events database 118, where the correlation engine uses them in subsequent cycles. Each cycle therefore operates on an enriched dataset that includes prior compound and correlated events, creating a reinforcing, machine-driven process. This is what makes an otherwise untraceable anomaly detectable: the system does not treat events as isolated observations, but normalizes, stores, weights, correlates, and reevaluates them as structured event records across time and space. Combining events that are insignificant when isolated can reveal anomalies distributed across disparate sensors, databases, time periods, or geographic locations. The ordered process improves surveillance-system operation by enabling detection capabilities unavailable from the individual inputs.

59. The Asserted Claims recite this ordered computational process. The system receives and processes sensory data from sensors such as IP video cameras to detect faces,

vehicles, license plates, object size, or object speed; stores those events in an event database; evaluates historical correlations among stored events across time and/or space using sensor or sensory-data attribute weights; and generates alerts based on critical events that are themselves based on those historical correlations. For example, a single tailgating event at a server room (MDParameterID=12) might not trigger a system-wide alert. If the correlation engine evaluates that compound event with a historically correlated network-failure event at the same location (MDParameterID=16) and a stolen-plate event in the adjacent parking lot (MDParameterID=15), all weighted by each sensor's attribute data, the weighted sum may exceed the configurable threshold, such as ThresholdValue=61 in Table 5, and produce a system-wide alert that no individual event would have triggered. '616 patent at 26:46-27:20; Table 5. The anomaly becomes detectable after the system normalizes, stores, weights, correlates, and reevaluates the events as enriched data. The claims thus recite a specific implementation of event analysis.

60. The correlation engine's forensic analysis of events, including how to calculate a weight for a particular attribute, is depicted in even greater detail in Figure 10 of the Specification:



‘616 patent, Fig. 10. Figure 10 depicts various sets of video data (i.e., $V_1$ through $V_i$; the large circles in the first column), with each subset (any of the rows) corresponding to data obtained from a particular video camera. ‘616 patent at 30:66-31:7. The dashed circles inside the larger circles ($V_1$ through $V_i$ in the first column) each represent a subset of video data from a particular camera. *Id.*

61. Figure 10 also depicts various sets of metadata (i.e., $M_1$ through $M_i$; the large circles in the second column). ’616 patent at 31:8-9. Each set of metadata is indexed and points to at least one set of video data. ‘616 patent at 31:9-17. In Figure 10, each set of metadata corresponds to one and only one set of video data, but the Specification is clear that the relationship between metadata and video data may be one-to-many, many-to-one, as well as many-to-many (i.e., a particular video data has metadata for location and frame rate). ‘616 patent at 31:17-21.

62. Finally, Figure 10 depicts various sets of attribute weight data (i.e., $W_1$ through $W_i$; the large circles in the third column). ‘616 patent at 31:22-24. The sets of attribute weight data “are sets of vectors … which represent weights associated with subsets of the metadata $M_i$.” ‘616 patent at 31:24-26. These weights may be multi-dimensional. ‘616 patent at 31:28-31. For example, a two-dimensional weight may represent the attribute weights associated with (i) the reliability of a particular video camera for motion detection reliability; and (ii) the reliability of that camera for gunshot detection reliability. ‘616 patent at 31:31-35. This would enable the system to account for the fact that a camera might have high motion detection reliability and low gunshot detection reliability, or vice-versa. ‘616 patent at 31:36-38.

63. The Specification provides an illustrative equation that can be used for determining weighted attribute data for a particular sensor:

$$w_i = \sum_{k=1}^{N} \omega_k a_k$$

'616 patent at 34:35-57. In this equation, "[t]he weights "$w_i$" may be a weighted average of attribute data ($a_i$)." '616 patent at 34:36-43. The symbol "$\omega_k$" refers to relative weights of the attributes ($a_k$), "which are themselves weights associated with the data sources." '616 patent at 34:55-57.

64. The Specification explains how attribute weights may be recalculated to yield weighted attribute data for (i) two or more events occurring substantially simultaneously, or (ii) any of two or more events occurring substantially simultaneously. '616 patent at 33:31-54. The formulae are as follows:

(i) $W(M_1 \cap M_2) = W(M_1) \cdot W(M_2)$

(ii) $W(M_1 \cup M_2) = W(M_1) + W(M_2) - W(M_1) \cdot W(M_2)$

*Id.*

65. The Specification provides several tables important to the correlation modules' function. The meta-data parameters table (Table 1) describes the primitive and compound events that are detected and recorded by the system and their associated parameters. The meta-data types table (Table 2) defines the primitive event types that may be detected and recorded, defines the composition of compound events, and assigns absolute values used by the correlation engine to the meta-data types. The events table (Table 3) is an important database used by the correlation engine and stores the actual primitive and compound events that were detected, as well as an index into the corresponding video data. The sources table (Table 4) defines the various devices including sensory devices, and their associated attributes and weights, and is the core database used by the correlation engine, network management module, and the HSM module. The rules

table (Table 5) defines the alerts and alert conditions used by the alert/action engine. '616 patent at 18:60-19:9.

66. As the compound events and correlated events are detected, the correlation module stores them in the events database 118. '616 patent at 8:62-66. The data may be stored in an events table, or database, such as the following:

TABLE 3

Events table

| MDEntryID | MDParameterID | MD_Event_DateTime | MD_Event_Duration | SrcID | Src_Description | Src_Location |
|---|---|---|---|---|---|---|
| . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 432 | 6 | 09/27/2007 7:05:24PM | 1:05 | 1 | Camera 1 | Lobby |
| 433 | 16 | 09/27/2007 7:10:18PM | 0:01 | 1 | Camera 1 | Lobby |
| 434 | 11 | 09/27/2007 8:13:08PM | 0:01 | 9 | Card Reader in Server Room | Server Room |
| 435 | 10 | 09/27/2007 8:13:10PM | 0:02 | 4 | Camera 34 | Server Room |
| 436 | 10 | 09/27/2007 8:13:14PM | 0:02 | 4 | Camera 34 | Server Room |
| 437 | 12 | 09/27/2007 8:13:24PM | 0:06 | 4 | Camera 34 | Server Room |
| 438 | 14 | 09/27/2007 9:05:00PM | 0:26 | 23 | Registered Student | Off-campus (River St.) |
| 439 | 15 | 09/27/2007 9:14:04PM | 0:10 | 2 | Camera 2 | Parking Lot |

'616 patent at Table 3, 21:54-22:20. Table 3 shows an illustrative events table, which corresponds to item 118 in Figures 1, 2, 4 and 5. '616 patent at 21:54-55. Here, the column "MDEntryID" contains the unique identifiers of the events. '616 patent at 21:57-58. "MDParameterID" refers to the types of events that were detected, which are fully described in a separate Metadata parameters table, i.e., Table 1. '616 patent at 21:58-60.

67. An example of a Metadata parameters table, which stores the various primitive and compound events that are detected and recorded by the present system and their associated parameters, is as follows:

TABLE 1

| Meta-data parameters table | | | | | |
|---|---|---|---|---|---|
| MDParametersID | Nickname | MDTypeID | SrcID | MD_TimeStart | MD_TimeEnd |
| 6 | Motion in Camera 1 | 1 | 1 | 17:00 | 8:00 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 10 | Person Enters Server Room | 23 | 4 | 0:00 | 23:59 |
| 11 | Swipe Card Detected to Server Room | 22 | 9 | 0:00 | 23:59 |
| 12 | Tailgating | 24 | 4 | 0:00 | 23:59 |
| 13 | Anonymous Video Tip | 98 | 22 | 0:00 | 23:59 |
| 14 | Registered Student Video Tip | 98 | 23 | 0:00 | 23:59 |
| 15 | Stolen Plate | 99 | 2 | 17:00 | 8:00 |
| 16 | Camera 1 loses connection | 105 | 1 | 0:00 | 23:59 |

‘616 patent at Table 1, 19:30-20:46. Here, the “MDParametersID” column contains the unique identifiers of the metadata parameter. ‘616 patent at 19:33-34, and “MDTypeID” refers to the Metadata types, which are fully described in a separate Metadata types table, i.e., Table 2. ‘616 patent at 19:35-37 and Table 2, 20:64-21:32. The “SrcID” column refers to the Sources table, i.e., Table 4, which describes the devices (such as video cameras and card readers) used by the correlation engine. ‘616 patent at 19:37-39 and Table 4, 23:48-24:17. The Specification provides a number of examples to illustrate the functionality of the Metadata parameters table and its relationship among the other tables. One example is as follows:

> For example, the row “MDParametersID=6” corresponds to an event with a nickname “Motion in Camera 1.” This event has “MDTypeID=1”, which by examining Table 2 corresponds to a motion event. It has “SrcID=1”, which by examining Table 4 corresponds to Camera 1 located in a lobby. Based on “MD_TimeStart” and “MD_TimeEnd”, this event is only being monitored and recorded between the hours of 5:00 PM (17:00) and 8:00 AM (8:00) to protect privacy or to follow a business rule.

‘616 patent at 19:42-50.

68. When the rule evaluation module 214 retrieves events from events database 118, it applies rules from rules database 216. ‘616 patent at 8:66-9:1. The rules database is another customization point: it permits the system to define the event conditions, thresholds, recipients,

actions, and escalation paths that matter for a particular installation, and which cause a particular alert. "Critical events" are "events that generate an alarm or trigger an action." An administrator may define the critical events, but Table 5 illustrates the objective, rule-based process by which the system issues an alert. An exemplar Rules table from the rules database is depicted as follows:

TABLE 5

Rules table

| RuleID | Nickname | MDParamterID | ThresholdValue | Contact ID | MsgTxt |
|---|---|---|---|---|---|
| 1 | Alert 1 | 6 | null | 4 | Motion in lobby during forbidden hours |
| 2 | Tailgating SR | 12 | null | 1 | Tailgating in server room |
| 3 | Global Alert | null | 61 | 7 | Null |
| 4 | Stolen Plate | 15 | null | 2 | Stolen plate detected in parking lot |
| 5 | Camera 1 goes down | 16 | null | null | Camera 1 has lost connection! |

'616 patent, Table 5 at 26:62-64. An exemplar description of an alert defined in Table 5 is provided by the Specification:

> In the sample Rules table shown in Table 5, "AlertID" is a primary key uniquely identifying each rule, "Nickname" provides a nickname for each rule, "MDParameterID" specifies which event (including primitive or compound events) that triggers the alert (or null if a system-wide alert), "ThresholdValue" specifies a threshold value which triggers an alert (for correlated system-wide alerts, or null if an event-based alert), "ContactID" specifies the group, or individual, that will receive the alert, or the set of actions that will be triggered by the alert, and "MsgTxt" specifies the text of the message sent on an alert. "ContactID" is a foreign key into another table (not shown) that specifies the list of recipients or the list of actions to be performed when the alert corresponding to "ContactID" is triggered.

'616 patent at 27:6-19. These fields show that the system is customizable at the database level: the rule, triggering event, threshold value, alert recipient, action set, and message text are structured data used by the alert/action engine, not ad hoc human judgment.

69. The Specification's "Database Design" section describes these and other tables and the relationships among them. '616 patent at Tables 1-7; 18:51-58.

70. Based on the rule evaluation module 214, correlation engine 117 issues alerts or performs other actions. '616 patent at 9:3-5. Alerts may issue in real time when a correlation exceeds a threshold, and specified conditions may limit when an alert or other action is triggered. '616 patent at 33:55-34:61. The result is an installation-specific implementation of surveillance analytics that applies configurable rules, thresholds, contacts, and actions to normalized and weighted event data.

71. Actions can be configured to trigger based on "accumulated value of multiple events across space and time." '616 patent at 34:7-10. The Specification provides three example equations:

$$a_1: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_1$$

$$a_2: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_2$$

$$\ldots$$

$$a_n: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_n$$

'616 patent at 34:10-34. In these equations, "a" indicates an action, "w" indicates attribute weights, "x" indicates non-video events, and "v" indicates video events. '616 patent at 34:14-16. In Eq.20, the first example above, action component $a_1$ will be activated if the expression on the left-hand side is greater than a predetermined threshold $\tau_1$. '616 patent at 34:11-14. These equations "could represent a hierarchy of actions that would be activated for different threshold scenarios." '616 patent at 34:16-18.

72. The Asserted Patents describe a Hierarchical Storage Manager (HSM) for storing large volumes of data generated by security and surveillance applications. '616 patent at Figure 4; 3:15-17; 6:39-49; 10:54-11:36; 13:36-47.




'616 patent at Figure 4 (rotated). The HSM resolves a problem that arises from the sheer volume of sensor data in smart surveillance systems. '616 patent at 11:3-14. Routine operation of the sensors in the claimed invention generates large amounts of data. '616 patent at 10:55-67. "For example, a typical 3-Mega-pixel digital surveillance camera generates images of approximately 280 Kbytes per second per frame. If the camera were running at 5 frames per second, it would generate approximately 60 GB per day. . . In a typical application having 100 surveillance cameras around a particular facility, this translates to 6 TB per day… or approximately 2,000 TB per year!" *Id.* "Ideally, requested data should be retrieved at the fastest rate and this is possible only if all of the data is available on high-speed devices at all the time, but this is beyond the ability of most

organizations." '616 patent at 10:67-11:3. HSM enables data to be moved from a faster storage medium (like cache) to a slower storage medium (such as tape). '616 patent at 11:6-14. One of the benefits of Hierarchical Storage is that "performance is improved as unused data is moved to lower level storage devices and frees up higher level (faster) storage devices, thus increasing overall system performance." '616 patent at 11:25-28. The Patent discloses particular ways of "cascading" storage. *See, e.g.*, '616 patent at 11:55-56; 12:55-58; 13:1-17; 37:5-15.

73. One embodiment is illustrated by video data. '616 patent at 11:55-12:33. A video data segment is stored by its importance ("Y"), which may be calculated as weighted attributes of the data (including attributes of the camera). '616 patent at 11:55-59. Such attributes include resolution of the data ("R"); age of camera ("A"); time since last maintenance on camera ("TM"); location of camera ("L"); reliability of the source (such as whether derived from a "video tip") ("RS"); time since video was last accessed ("TS"); time when video was recorded; and the type of event detected, such as whether the data includes a "primitive event," along with attributes of the data. '616 patent at 11:61-12:9. A "primitive event" is an "atomic, indivisible event[s] from any subsystem," such as people entering a designated area, a package left behind in an area, a gunshot detected, a count of the number of cleaning people entering a building at a certain time, locks on gates not engaged, and so on. '616 patent at: 4:4-11; 38:3-39:17.

74. The importance of the video data segment may be calculated as a weighted average, as shown in the equation ($a_i$ is the attribute of the data and $w_i$ is the relative weight):

$$Y = \sum_{i=1}^{i=N} w_i a_i$$

'616 patent at 12:10-20.

75. For example, in a case of six attributes for a particular video data segment, each weighted equally, the importance is calculated as "Y=(L+R+A+RS+TM+TS)/6." '616 patent at 12:28-32. Depending on the value of Y, the video data may be stored in the highest or other lower storage hierarchy. '616 patent at 12:22-27; 13:30-35. When a given hierarchical level becomes nearly full, the video segments of lowest importance are automatically cascaded to free space to accommodate new data. '616 patent at 12:65-13:17. A hierarchical storage manager (HSM) 401 manages the storage of the video data segments and their corresponding locations. '616 patent at 13:36-39. The stored events may be later queried and retrieved from the appropriate hierarchy and migrated to a faster location for processing. '616 patent at 11:3-14.

76. The HSM implements the following functions and subsystems, or a subset thereof: (a) a storage hierarchy with on-site and off-site (network- or cloud-based) storage at different speeds and costs; (b) HSM migration, moving data between levels under preset mathematical rules or operator override; (c) HSM archiving, moving data to slower or remote storage based on importance or frequency of use; (d) an HSM rules engine, automatically changing data-storage locations when predefined policy rules are triggered; and (e) HSM audit trails, storing an audit record for each data-access event to enhance data privacy. '616 patent at 13:36-16:51. The HSM thus provides a formal framework for managing the volume of data produced by security and surveillance systems.

77. The HSM's technical improvement lies in its software structures and processes rather than its physical components. In the Asserted Claims, it manages and cascades data through a hierarchy of storage devices based on sensory events. The HSM is a specialized server because it implements an architectural framework for managing that cascade based on sensory events. It addresses the problem identified in the Specification: "[i]deally, requested data should be retrieved

at the fastest rate," but "this is possible only if all of the data is available on high-speed devices at all the time, but this is beyond the ability of most organizations." '616 patent at 10:67–11:38. Its rules engine, migration policies, and archiving functions (codified by preset mathematical rules or operator override) prevent data overload, system crashes, and latency that would otherwise degrade real-time threat detection. This is an unconventional technological solution to a technological problem. By cascading data based on sensory events and customizable criteria, the HSM ensures that the most operationally critical primitive sensory event data remains accessible at high speed while preventing system failure from data volume overload. The ordered combination of analytics, weighting, rules, correlation, and HSM cascade therefore narrows the claims to a particular implementation of smart-surveillance data management rather than preempting all ways of storing security data.

## VI. The Asserted Claims are not Abstract and Recite Inventive Concepts

78. The Asserted Claims recite specific improvements in computerized surveillance and security systems, including machine processing of heterogeneous sensor data, weighting based on sensor or sensory-data attributes, correlation of multiple events across time and space, storage and retrieval of structured event records, configurable rule evaluation, real-time monitoring, and, in certain claims, hierarchical storage management based on sensory events. These claimed operations improve how computerized surveillance systems process, correlate, monitor, and store sensor-derived information.

79. The human mind is not equipped to perform the functions recited in the Asserted Claims, which were designed to improve problems in existing smart-surveillance systems. The claims require computer processing of sensor-generated event data, including combinations of normalization, structured event storage and retrieval, sensor-attribute weighting, automated historical correlation, continuous real-time monitoring, network-status monitoring, rule

evaluation, and event-based storage management. These operations arise within computerized security systems and are not mental processes that a human can perform in the claimed manner.

80. Security personnel may use the system's output, but the claimed improvement lies in the system's architecture and computational processes. The Asserted Claims require machine processing of sensor events and sensor-related data to create, store, weight, correlate, monitor, and act upon event information in ways that differ from a guard's observation of camera feeds or isolated sensor alarms.

81. The Asserted Claims recite weighting sensory events based on attribute data of the sensors or sensory data. *See* '616 patent claim 48; '984 patent claim 10; '314 patent claim 13; '342 patent claim 17; '460 patent claim 11; '744 patent claim 16. The '870 patent claim 20 likewise requires historical correlation based at least on weighting of stored sensory events. The Specification adds information about the sensors or sensory data to the event-processing operation, including reliability-related attributes not available from merely viewing a camera feed. It identifies the need for "a method, apparatus, and system of alerting that weights input data from disparate systems to lower false alarm rates and to filter out unwanted, spurious, or intentionally distracting information." '616 patent at 2:10-13. This limitation captures a technical improvement in machine evaluation of heterogeneous sensor information.

82. At the time of the inventions in 2007, the specific ordered combinations recited in the Asserted Claims were not well-understood, routine, or conventional to a person of ordinary skill in computerized security and surveillance systems. No commercially available system known to Plaintiff taught or suggested the particular claimed arrangements of attribute-based weighting, structured event storage and retrieval, historical or multi-event correlation across time and space, configurable rule evaluation and responsive actions, and, in certain claims, event-based

hierarchical storage management. The Specification teaches multi-dimensional weight vectors (W1 through Wi) representing probabilistic weights associated with subsets of metadata to calculate weighted attribute data for a particular sensor. ‘616 patent at 34:35–60 (Equation 23). This probabilistic, machine-executed weighting is fundamentally different from any subjective assessment a human could perform. The claimed ordered combinations produce functionality, including detection of relationships and anomalies through repeated processing of enriched event records, that is more than the predictable sum of individually known components and supplies an inventive concept.

83. A second group of Asserted Claims requires storing sensory events for later retrieval and evaluating historical correlations among stored events across at least one of time and space. *See* ‘342 patent claim 17; ‘314 patent claims 13 and 21; ‘616 patent claim 48; ‘870 patent claim 20; ‘984 patent claim 10. Claims 48 of the ‘616 patent and 10 of the ‘984 patent additionally require retrieving historical normalized or stored sensory events and continuously monitoring primitive sensory events in real time based on the historical correlations; the ‘314 claims require monitoring received sensory events to identify critical events based on historical correlations. The Specification’s event architecture creates structured event records with event identifiers, event types, timestamps, durations, and source-device references, and permits correlated events to include temporal and spatial metadata produced by the correlation engine rather than present in raw sensor inputs. ‘616 patent at Table 3; 8:62-9:2; 21:54–22:25.

84. The Asserted Claims also recite a correlation module or correlation engine that evaluates historical correlations among stored sensory events across at least one of time and space. *See* ‘616 patent claim 48; ‘984 patent claim 10; ‘314 patent claims 13 and 21; ‘870 patent claim 20; ‘342 patent claim 17; ‘460 patent claim 11; ‘744 patent claims 16 and 26. The process evaluates

stored events for historical correlations, and in certain claims continuously monitors stored events in real time and identifies critical events based on those historical correlations. The resulting correlated event is a distinct data type with its own absolute value and temporal and spatial metadata computed by the correlation engine rather than present in the raw sensor inputs. '616 patent at Table 3; 8:62-9:2. The system writes this enriched data back into the events database through the computerized loop shown in Figure 2. The loop allows the system to detect anomalies that no individual event would trigger. In 2007, prior-art security systems could collect data from distributed sensors but could not process heterogeneous sources through historical correlations across time and space. Those limitations produced false alarms and missed important anomalies.

85. The Specification describes a computerized correlation loop in which compound and correlated events are stored as structured records in the events database and can be used in subsequent processing. That architecture permits the system to identify relationships and anomalies that isolated observations would not reveal. In 2007, prior-art security systems could collect data from distributed sensors but did not provide the claimed combinations of structured event storage, attribute-based weighting, historical or multi-event correlation, real-time monitoring, rule-driven responses, and event-based storage management reflected in the Asserted Claims. Although IBM's Smart Surveillance System (S3) publications from 2005 described automatic information extraction from surveillance data and detection of certain primitive events, they did not disclose the particular combinations asserted here, including, as applicable, sensor-attribute weighting, historical correlation of enriched event records across time or space, configurable rule evaluation applied to weighted and correlated data, and hierarchical storage management cascading data based on sensory events.

86. The Asserted Claims that include hierarchical storage management require a hierarchical storage manager to manage storage and cascade data through a hierarchy of two or more storage devices based at least on sensory events. *See* '342 patent claim 17; '314 patent claims 13 and 21; '870 patent claim 20; '744 patent claim 26. The Specification describes HSM rules, migration policies, and archiving functions that move data through storage tiers. '616 patent at Figures 4–5; 10:55–16:48. It identifies a surveillance-specific data-volume problem: "Ideally, requested data should be retrieved at the fastest rate and this is possible only if all of the data is available on high-speed devices at all the time, but this is beyond the ability of most organizations." '616 patent at 10:67–11:3. The disclosed HSM can use the presence and importance of sensory events in determining storage location, cascade lower-priority data to lower storage tiers, and later retrieve or migrate stored data for processing. '616 patent at 11:3–14; 12:44–13:49; 14:39-16:48; 34:35-60. These claims therefore recite event-driven storage management rather than generic data storage.

87. The Asserted Claims recite a sensory event analytics module, or receiver, that receives sensory data about a physical environment from one or more sensors comprising at least an Internet Protocol (IP) video camera, and processes that data to detect sensory events selected from defined categories, including a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object. *See* '616 patent claim 48; '984 patent claim 10; '314 patent claims 13 and 21; '870 patent claims 1 and 20; '342 patent claims 12, 17, and 20; '460 patent claims 11, 13, and 14; '744 patent claims 16 and 26. The Specification describes data collected from video cameras and other sensory devices and processed by video analytics modules to identify primitive events, including automatically detected events and structured event data. '616 patent at 4:4–11; 5:31–6:38. These limitations require a particular machine-based receiver

and analytics pipeline that converts physical-environment data into specified event records; they do not merely call for observing a scene or recognizing a result.

88. Certain Asserted Claims also recite a legacy event analytics module adapted to receive legacy system data from one or more legacy systems and process that data to detect primitive legacy events. See ‘460 patent claims 11, 13, and 14; ‘744 patent claims 16 and 26. The ‘744 claims identify legacy systems selected from access control, personnel, license plate, inventory, law enforcement, and lighting systems. The Specification describes collecting security-related data from a card access system, a personnel system, a vehicle information module, and other sources and processing those inputs into primitive events. ‘616 patent at 5:31–6:38. This limitation requires machine integration and event extraction from heterogeneous non-sensor systems rather than a guard’s manual comparison of separate records.

89. Certain Asserted Claims recite a network analytics module adapted to receive IP data, including an IP address and network status, and to process that IP data to detect primitive network events. See ‘460 patent claims 11, 13, and 14. Claims 48 of the ‘616 patent and 10 of the ‘984 patent further require continuously monitoring in real time the network status of one or more sensors based on the IP data to identify network failure events. The Specification shows the correlation engine receiving inputs from the events database and configuration databases containing sensor attributes and rules and describes the use of reliability information in the system’s operation. ‘616 patent at 7:10–15; 26:33–44. These limitations require machine monitoring of network conditions and identification of network failures, not merely transmitting surveillance data over a network.

90. Certain Asserted Claims recite a normalization engine adapted to normalize primitive sensory events, primitive legacy events, and primitive network events into a standardized

data format, thereby generating normalized sensory, legacy, and network events. See ‘460 patent claims 11, 13, and 14. Claims 48 of the ‘616 patent and 10 of the ‘984 patent likewise recite normalizing primitive sensory events into a standardized data format. The Specification states that primitive events are normalized into a “normalized event 115,” a standardized format the system can recognize, and explains that each type of sensory device may have its own normalization engine or may be handled by modules within a single normalization engine. ‘616 patent at 6:21–28; 6:50–63. This limitation is a particular data transformation that permits heterogeneous inputs to be processed together, not merely the storage of unprocessed observations.

91. The Asserted Claims recite an event queue and event database that store detected or normalized events for later retrieval. See ‘616 patent claim 48; ‘984 patent claim 10; ‘314 patent claims 13 and 21; ‘870 patent claims 1 and 20; ‘342 patent claims 17 and 20; ‘460 patent claims 11, 13, and 14; ‘744 patent claims 16 and 26. The Specification illustrates normalized events placed in an event queue for processing by the correlation engine and event-database tables storing detected events with unique identifiers, event types, timestamps, durations, source-device references, and correlated or compound-event records. ‘616 patent, Table 3; 21:54–22:20. This structured, retrievable event architecture is not a generic storage instruction; it creates records for subsequent machine correlation.

92. The Asserted Claims recite an alerting module or engine to send alerts based on critical events. *See* ‘314 patent claims 13 and 21; ‘460 patent claims 11, 13, and 14; ‘744 patent claims 16 and 26; ‘616 patent claim 48; ‘984 patent claim 10. In the ‘460 claims, critical events are based at least on historical correlations among stored sensory, legacy, and network events; the ‘314 claims additionally require communication among the sensory event analytics, storage, correlation, and alerting components over an IP network. The Specification describes a rule

evaluation module applying rules from a rules database and driving an alert/action engine; Table 5 includes event identifiers, threshold values, contacts or actions, and message text, and the system issues alerts or actions when the specified conditions are met. ‘616 patent at 8:66–9:5; Table 5; 26:46–27:20. These limitations require rule-based alert generation from correlated data, not a generic instruction to notify a person.

93. The ‘460 patent claims further recite specific sensor attributes. Claim 13 requires attribute data comprising sensor age, and claim 14 requires attribute data comprising time since last maintenance. *See* ‘460 patent claims 13 and 14. The Specification identifies age of camera and time since last maintenance as attributes used in calculating the importance of a video data segment and provides that these attributes may be combined with other weighted factors in deciding how data is handled. ‘616 patent at 11:61–12:9. On information and belief, these attributes are not available to human security guards merely viewing camera feeds. Their use therefore requires the claimed system to collect, store, and algorithmically apply machine-readable sensor-history data, which is not a mental process.

94. The ‘342 and ‘870 patents also recite tip-data processing. Claims 12 of the ‘342 patent and 12 of the ‘870 patent require receiving tip data from external sources, generating tip events based on that data, correlating tip events with sensory events, and generating alerts based on the correlation. *See* ‘342 patent claim 12; ‘870 patent claim 12. The Specification describes a video tip system among the sources of security-related data and identifies the reliability of a source, including whether data is derived from a video tip, as an attribute; it further describes primitive events as atomic events from any subsystem and the correlation of event information to produce responsive actions. ‘616 patent at 5:31–6:38; 38:3–39:17. This limitation requires integrating

externally supplied tip data into the computerized event architecture and correlating it with sensor-derived events, rather than merely receiving a human report.

95. Several Asserted Claims require continuous real-time monitoring of incoming events based on historical correlations. *See* '616 patent claim 48; '984 patent claim 10; '314 patent claims 13 and 21; '460 patent claims 11, 13, and 14; '744 patent claims 16 and 26. The Specification describes the correlation module comparing current and past events across time and space and a computerized loop, illustrated in Figures 1 and 2, that processes, stores, correlates, and reevaluates event records; it also describes alerts and actions based on accumulated values of events. '616 patent at 8:44–9:5; Figures 1–2. Continuous real-time monitoring ties historical data retrieval and correlation to ongoing event processing and alerting, requiring a machine-executed temporal process rather than a static review of stored records.

96. Certain Asserted Claims additionally require alerting based on critical events, with communication among system components occurring over an IP network. *See* '314 patent claims 13 and 21. The '616 patent claim 48 and '984 patent claim 10 require receiving IP data including at least an IP address and network status of the sensors, monitoring continuously and in real-time the network status to identify network failure events, and sending alerts based on critical events and/or network failure events. These IP and network-status limitations anchor the claims to IP-based sensor network architecture rather than generic surveillance data analysis.

97. The Asserted Claims recite different, but overlapping, ordered combinations of these computerized functions. Claims 48 of the '616 patent and 10 of the '984 patent require normalization, event-database storage and retrieval, historical correlation, continuous real-time monitoring, IP and network-status information, alert generation, and attribute-based weighting. Claims 17 of the '342 patent, 13 and 21 of the '314 patent, and 20 of the '870 patent require

combinations of event storage and retrieval, historical correlation, weighting, IP-camera event analytics, alerts and/or IP-network communication, and, for the '342, '314, and '870 claims, event-based hierarchical storage management. Claims 11, 13, and 14 of the '460 patent require legacy event analytics, network analytics, normalization, correlation, alerting, and weighting based on sensor age and maintenance history, while claims 16 and 26 of the '744 patent require legacy event analytics, correlation, alerting, weighting, and hierarchical storage management. The Asserted Claims therefore do not claim surveillance analysis at a result-only level; they recite particular arrangements of computational operations and data flows.

98. These claimed components and operations work together as machine-driven security-system architectures. The asserted combinations depend on structured event data, sensor or network attributes, automated correlation, database retrieval, real-time monitoring, rule processing, and/or event-driven storage management that a generic computer performing unspecified analysis, or a human security guard, does not replicate.

99. The Asserted Claims recite these improvements through concrete architectural components and computational steps. The Asserted Claims require, in various combinations: (1) processing sensor data through a sensory event analytics module or receiver to detect primitive or specified sensory events, including faces, vehicles, license plates, object size, or object speed ('616 claim 48; '984 claim 10; '314 claims 13 and 21; '870 claims 1 and 20; '342 claims 12, 17, and 20; '460 claims 11, 13, and 14; '744 claims 16 and 26); (2) normalization into a standardized data format ('616 claim 48; '984 claim 10; '460 claims 11, 13, and 14); (3) an event queue and event database for storing events for later retrieval, together with evaluation of historical correlations among stored events across at least one of time and space ('616 claim 48; '984 claim 10; '314 claims 13 and 21; '870 claims 1 and 20; '342 claims 17 and 20; '460 claims 11, 13, and 14; '744

claims 16 and 26); (4) weighting using sensor or sensory-data attribute information, including historical correlation based at least on weighting of stored sensory events (‘616 claim 48; ‘984 claim 10; ‘314 claim 13; ‘342 claim 17; ‘870 claim 20; ‘460 claims 11, 13, and 14; ‘744 claim 16); (5) hierarchical storage management based at least on sensory events (‘342 claims 17 and 20; ‘314 claims 13 and 21; ‘870 claim 20; ‘744 claim 26); (6) alerting based on critical events and/or communication over an IP network (‘616 claim 48; ‘984 claim 10; ‘314 claims 13 and 21; ‘460 claims 11, 13, and 14; ‘744 claims 16 and 26); (7) IP or network-status processing, including receiving IP address and network status data and identifying network failure events (‘616 claim 48; ‘984 claim 10; ‘460 claims 11, 13, and 14); (8) legacy event analytics for receiving legacy system data and detecting primitive legacy events (‘460 claims 11, 13, and 14; ‘744 claims 16 and 26); (9) continuous real-time monitoring of incoming sensory, legacy, and network events based on historical correlations (‘616 claim 48; ‘984 claim 10; ‘314 claims 13 and 21; ‘460 claims 11, 13, and 14; ‘744 claims 16 and 26); (10) receiving tip data from external sources, generating tip events, correlating tip events with sensory events, and generating alerts based on that correlation (‘342 claim 12; ‘870 claim 12); (11) sensor age as attribute data (‘460 claim 13); and (12) time since last maintenance as attribute data (‘460 claim 14). These limitations define how the asserted surveillance technologies achieve their improvements; they do not simply call for analyzing surveillance data or alerting when something appears suspicious.

## VII. Flock Product Offerings

100. Flock Safety’s Falcon® license-plate-reader cameras are solar-powered and LTE-connected and collect images of vehicles and license plates from the physical environment. Flock defines an LPR system as one or more automated high-speed cameras used with data processing to convert images of vehicles and license plates into computer-readable data. The resulting LPR

data includes a license-plate image, vehicle image, vehicle characteristics such as color and make, plate number and state, date, time, and camera location. Flock further states that its LPR cameras capture license plates and vehicle characteristics as searchable evidence. These disclosures establish receipt and machine processing of sensory data from network-connected video cameras to detect at least vehicle and license-plate sensory events.[3]

101. Networked Falcon cameras capture images of passing vehicles and transmit them to Flock's cloud; cloud-based machine-learning software identifies license-plate characters and analyzes vehicle attributes to generate a searchable Vehicle Fingerprint; and the platform then delivers location-based notifications for custom hotlists, NCIC wanted lists, AMBER alerts, silver alerts, Vehicle Fingerprint matches, and related events. Falcons are motion-activated, LTE-connected devices using machine vision and on-device processing. Vehicle Fingerprint is proprietary machine vision that analyzes plate/state recognition and vehicle attributes such as color, type, make, roof racks, and bumper stickers.[4]

---

[3] *See* Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy (last updated June 30, 2026); Flock Safety, License Plate Recognition Cameras, https://www.flocksafety.com/ebooks/license-plate-reader-cameras-overview (updated Aug. 13, 2026); Flock Safety, Transportation, https://www.flocksafety.com/use-case/transportation.

[4] *See* Flock Safety, License Plate Readers, https://www.flocksafety.com/products/license-plate-readers; Flock Safety, Flock Safety Platform, https://www.flocksafety.com/products/flock-safety-platform; Flock Safety, Frequently Asked Questions, https://www.flocksafety.com/faq; Flock Safety, Evidence Policy, https://www.flocksafety.com/legal/flock-evidence-policy; Town of Los Gatos public Flock materials, https://mccmeetingspublic.blob.core.usgovcloudapi.net/losgatos-meet-9e45bf36f0a649f6abe482aad0f840f8/ITEM-Attachment-003-40117a1fb91a4be295b5432f44b21f52.pdf; City of Madison, Alabama public Flock materials, https://mccmeetingspublic.blob.core.usgovcloudapi.net/madisonal-meet-ca852550c3514552ba469e40303a95d0/ITEM-Attachment-001-31edd803004d4841ac9909fa404f89dc.pdf.




*Flock "Detect / Decode / Deliver" workflow reproduced in public customer materials.*

102. Flock converts raw camera imagery into structured, computer-readable LPR data and stores both footage and metadata for later retrieval. Flock states that LPR data is stored briefly on the camera and then transferred to AWS Government Cloud, and its Privacy Policy states that footage is collected on Flock devices and transmitted to Amazon S3, with both footage and metadata encrypted in the cloud. On information and belief, the common computer-readable representation used by Flock's search and analytics services is a standardized event format, and Flock's software queues the resulting sensory, legacy, and network event records for storage in one or more event databases and later retrieval.[5]

103. Flock's Enhanced LPR and FlockOS® products evaluate relationships among stored and current event records across time and geographic space. Enhanced LPR's Multi-Geo Search permits an investigator to enter the time and location of multiple incidents and identify vehicles that appear across those incidents; Convoy Search identifies vehicles traveling together; Enhanced LPR also identifies patterns such as plate swaps and interstate travel. FlockOS unifies

---

[5] *See* Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy; Flock Safety, Privacy Policy, https://www.flocksafety.com/legal/privacy-policy; Flock Safety, Frequently Asked Questions, https://www.flocksafety.com/faq.

LPR, video, sensors, CAD, RMS, DFR, 911, gunshot detection, and other sources, analyzes real-time data, links events, highlights movement, and surfaces priority information. FlockOS also delivers instant alerts and shared intelligence. On information and belief, these functions retrieve stored events, evaluate historical correlations across time and/or space, continuously monitor incoming events in real time in view of those correlations, identify critical events, and generate responsive alerts.[6]

104. Flock's public demonstrations show the same functions operating together as an integrated workflow. In Flock's Real-Time Policing in Action demonstration, the system ingests 911 information and other real-time inputs, and the later demonstration segment shows FreeForm AI locating a vehicle and an LPR hotlist alert. A separate FlockOS Real-Time Crime Center demonstration shows multi-source correlation and a unified operational view.[7]

105. Flock states that FreeForm permits natural-language searches across video and LPR evidence together, surfaces relevant visual matches across enabled video feeds and LPR systems, and presents vehicle results, video matches, alerts, and related evidence in one interface. FreeForm can notify users when relevant matches are detected. Flock advertises instant alerts for people and

---

[6] *See* Flock Safety, Enhanced LPR: See Crime Patterns Standard LPR Misses, https://www.flocksafety.com/enhanced-lpr-stop-crime-patterns-that-standard-lprs-cant-see; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os.

[7] *See* Flock Safety, Real-Time Policing in Action with Flock Safety, YouTube, https://www.youtube.com/watch?v=TfeT83cffWA, at 0:00-0:30 and 1:00-2:00; Flock Safety, FlockOS Real-Time Crime Center demonstration, YouTube, https://www.youtube.com/watch?v=BrtrCkkyECU, at 0:00-0:30 and 0:30-1:45; Flock, Real-time policing with tech: 911, LPR, drones, AI, LinkedIn (describing 911, LPR, drone, live video, and AI-powered FreeForm insights working together), https://www.linkedin.com/posts/flock-safety_real-time-policing-in-action-with-flock-safety-activity-7361449011565760512-NLn-/.

vehicles, integration with LPR, gunshot, and drone systems, cloud search and sharing, and rapid searches of recorded footage using FreeForm and Video Events.[8]




*FlockOS depiction connecting devices, systems, and agencies in a common real-time view.*

106. Flock's LPR and device-health functions also apply confidence, quality, connectivity, and performance information in machine processing. Flock's LPR Policy states that its cameras self-monitor connectivity and functionality and that low-confidence plate reads are not sent to the user. A publicly exposed Flock demo likewise showed that Vehicle Fingerprint uses confidence-based scoring across ten identifiers and permits confidence levels to be adjusted for vehicle-body, color, make, and identifier searches. The reported default thresholds were 0.75 for make, color, and body type; 0.55 for roof rack, bumper stickers, window stickers, and tool box; 0.50 for back rack; a full-string match for license plate; and a frequency-based "number of times seen" criterion in detection details. The same interface expressly displays adjustable confidence levels, including "High: 75%" settings.

---

[8] *See* Flock Safety, How AI Video Search Helps Healthcare Security Teams Respond Faster (July 24, 2026), https://www.flocksafety.com/blog/how-ai-video-search-helps-healthcare-security; Flock Safety, Video Cameras, https://www.flocksafety.com/products/video-cameras; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os; Flock Safety, Real-Time Crime Center, https://www.flocksafety.com/use-case/real-time-crime-center.

107. Its software measures camera performance and image quality to diagnose issues and schedule service calls.

108. Vehicle Signature permits searches based on machine-derived vehicle characteristics, including body type, make, color, and other features. On information and belief, Flock stores and applies machine-readable confidence, threshold, image-quality, performance, connectivity, and related sensor or sensory-data attributes when determining the significance, reliability, classification, or disposition of sensory events.[9]




[9] *See* Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy; Flock Safety, What to Expect When You Become a Flock Safety Customer, https://www.flocksafety.com/blog/installing-a-flock-safety-camera; Flock Safety, Frequently Asked Questions, https://www.flocksafety.com/faq.; Joshua, How a Misconfigured Demo Exposed Flock Safety's 83,000-Camera Nationwide Tracking System, NexaNet Security Research Team (July 15, 2025), https://nexanet.ai/blog/misconfigured-demo-exposed-flock-safetys-83000-camera-nationwide-tracking-system.

| Vehicle trait | Default threshold |
|---|---|
| License plate | Full-string match |
| Make | 0.75 |
| Color | 0.75 |
| Body type | 0.75 |
| Roof rack | 0.55 |
| Back rack | 0.50 |
| Bumper stickers | 0.55 |
| Window stickers | 0.55 |
| Tool box | 0.55 |
| Times seen | "Number of times see |

*Publicly exposed Flock Vehicle Fingerprint interface and reported default confidence thresholds.*

109. Its developer materials and additional public reporting provide further evidence that this scoring is operational data used by the system, not merely a descriptive label. Flock's LPR Plate Lookup API returns confidence-scored license-plate and issuing-state results. Each read carries a confidence score and that low-confidence reads are flagged and withheld from officer alerts. Public reporting has reproduced an actual Flock read displaying a numerical plate-confidence value of .84. Together with the exposed Vehicle Fingerprint interface and its trait-specific default thresholds, these materials support the inference that Flock assigns different machine-computed significance to captured event information and uses those numerical results to rank, filter, suppress, search, match, and alert on sensory events.[10]

[10] *See* Flock Safety, LPR Plate Lookup API Guide, https://docs.flocksafety.com/developer-hub/v4.0/docs/lpr-plate-lookup-api-guide; Flock Safety, Flock Updates Privacy, Accountability, Security, and Transparency Safeguards, https://www.flocksafety.com/blog/flock-guardrails-address-lpr-privacy-concerns-and-police-transparency; Joshua, How a Misconfigured Demo

110. FlockOS provides the claimed integration of sensory events with legacy-system information. Flock states that FlockOS connects video, LPR, sensors, CAD, RMS, DFR, 911, gunshot detection, and other systems in one platform and real-time map, and that it can connect devices, systems, and agencies from multiple vendors. Flock911, for example, provides live 911 audio, caller location, transcripts, post-call playback, location-based alerts, and a unified evidence view that pairs 911 information with LPR hits, video, and gunshot detection. These integrations include at least license-plate and law-enforcement systems of the types recited in the Asserted Claims.[11]

111. Flock separately markets FlockOS and OS Real Time as a single operational environment for otherwise separate public-safety systems. FlockOS integrates major CAD, RMS, and video platforms into a single view, and that OS Real Time combines alerts and data from LPR, video, gunshot detection, drones, CAD, RMS, and other systems with built-in communications. Flock's Real-Time Crime Center materials similarly describe cross-jurisdictional exchange of live alerts, BOLOs, and incident information.[12]

---

Exposed Flock Safety's 83,000-Camera Nationwide Tracking System, NexaNet Security Research Team (July 15, 2025), https://nexanet.ai/blog/misconfigured-demo-exposed-flock-safetys-83000-camera-nationwide-tracking-system; Business Insider, Flock Safety ALPR Cameras Misreads (Mar. 2026), https://www.businessinsider.com/flock-safety-alpr-cameras-misreads-2026-3.

[11] *See* Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os; Flock Safety, Flock911, https://www.flocksafety.com/products/flock911.

[12] *See* Flock Safety, Law Enforcement, https://www.flocksafety.com/industries/law-enforcement; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os; Flock Safety, Real-Time Crime Center, https://www.flocksafety.com/use-case/real-time-crime-center; Flock Safety, Enhanced LPR: See Crime Patterns Standard LPR Misses, https://www.flocksafety.com/enhanced-lpr-stop-crime-patterns-that-standard-lprs-cant-see; Flock Safety, Solve Cases Faster, Cut Backlogs, and Avoid Burnout: The Power of a Smarter LPR, https://www.flocksafety.com/blog/reduce-case-backlogs-and-overtime-with-tech.

112. The Flock System also receives externally supplied watch-list, incident, and investigative information and correlates it with camera detections to generate alerts. Flock defines an LPR alert as a notification generated when a vehicle passes an LPR camera with a license plate or vehicle characteristics matching data held by NCIC, NCMEC, or another database or hot list. Enhanced LPR permits users to attach case notes, photographs, and reports to vehicle information, and FlockOS provides cross-agency shared intelligence and instant alerts.[13]

113. Public customer records independently corroborate Flock's storage, search, and alert functionality. Englewood Police materials state that captured data is sent to a secure cloud-based platform where it is stored, includes license-plate numbers and additional vehicle details, and can be accessed by authorized users; those materials also describe real-time alerts when a vehicle of interest passes a Flock camera. Other municipal Flock materials describe the same cloud-based Detect/Decode/Deliver architecture and Vehicle Fingerprint machine vision. This customer-side evidence is consistent with Flock's own Evidence Policy, LPR Policy, product documentation, and demonstration videos.[14]

---

[13] *See* Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy; Flock Safety, Enhanced LPR: See Crime Patterns Standard LPR Misses, https://www.flocksafety.com/enhanced-lpr-stop-crime-patterns-that-standard-lprs-cant-see; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os.

[14] *See* City of Englewood public Flock materials, https://englewoodgov.civicweb.net/document/433609/; Town of Los Gatos public Flock materials, https://mccmeetingspublic.blob.core.usgovcloudapi.net/losgatos-meet-9e45bf36f0a649f6abe482aad0f840f8/ITEM-Attachment-003-40117a1fb91a4be295b5432f44b21f52.pdf; City of Madison, Alabama public Flock materials, https://mccmeetingspublic.blob.core.usgovcloudapi.net/madisonal-meet-ca852550c3514552ba469e40303a95d0/ITEM-Attachment-001-31edd803004d4841ac9909fa404f89dc.pdf; Flock Safety, Evidence Policy, https://www.flocksafety.com/legal/flock-evidence-policy; Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy.

114. Flock's audio-detection products provide an additional sensory-event source. Flock states that its Gunshot and Audio Detection identifies gunfire and other critical sounds, filters and verifies qualifying acoustic events, sends alerts, and connects audio signals with video footage and license-plate data through FlockOS. Flock also advertises real-time event logging, policy-based alert rules, and system-health alerts for the audio product.[15]

115. The Flock System receives and acts on network and device-status information. Falcon LPR cameras are LTE-connected, Flock states that the cameras self-monitor connectivity and functionality, and Flock continuously monitors camera health and generates automated alerts when a camera needs attention. Flock's implementation materials for integrated video systems also require camera network information including an IP address and port information and identify an IP address used by Flock for VMS access. On information and belief, Flock's network analytics receives IP data including IP address and network status, processes that data to detect network events, continuously monitors network status to identify network-failure events, and normalizes and stores those network events with other Flock event records. Flock also installs, services, and maintains its devices and states that it measures camera performance and image quality to diagnose issues and schedule service calls. On information and belief, Flock therefore maintains installation,

[15] *See* Flock Safety, Audio Detection & Gunshot Detection, https://www.flocksafety.com/products/gunshot-detection; Flock Safety, Gunshot Detection, https://www.flocksafety.com/devices/gunshot-detection.

operational-age, service, and maintenance-history information for individual sensors and uses sensor age and time since maintenance, along with health and performance data.[16, 17]

116. Flock implements distributed storage and communication across the camera and cloud. Data is stored temporarily on the camera until upload to the cloud and is then automatically removed from the local camera; cloud data, including footage and metadata, is stored with AWS using AES-256 encryption and is automatically deleted according to a rolling retention policy. LPR data is stored briefly on the camera and then transferred to AWS Cloud. Communication from LTE-connected cameras to Flock's cloud and among FlockOS services occurs over IP networks.[18]

---

[16] *See* Flock Safety, License Plate Recognition Cameras, https://www.flocksafety.com/ebooks/license-plate-reader-cameras-overview; Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy; Flock Safety, What to Expect When You Become a Flock Safety Customer, https://www.flocksafety.com/blog/installing-a-flock-safety-camera; Flock Safety implementation materials, https://d3n9y02raazwpg.cloudfront.net/cityblm/f6ec8a35-5bbe-11ee-ae13-0050569183fa-791fe512-602c-4d20-98c8-ecdbbed39134-1707417752.pdf.

[17] *See also* Flock Safety, Products, https://www.flocksafety.com/products; Flock Safety, License Plate Readers, https://www.flocksafety.com/products/license-plate-readers; Flock Safety, Flock Safety Platform, https://www.flocksafety.com/products/flock-safety-platform; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os; Flock Safety, Enhanced LPR, https://www.flocksafety.com/enhanced-lpr-stop-crime-patterns-that-standard-lprs-cant-see; Flock Safety, Real-Time Crime Center, https://www.flocksafety.com/use-case/real-time-crime-center; Flock Safety, Privacy and Access, https://www.flocksafety.com/blog/privacy-and-access; Flock Safety, How Flock Safety Protects Resident Privacy, https://www.flocksafety.com/blog/how-flock-safety-protects-resident-privacy; Flock Safety, Statement on Network Sharing Use Cases and Federal Cooperation, https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation; Electronic Frontier Foundation, EFF's Investigations Expose Flock Safety's Surveillance Abuses: 2025 in Review, https://www.eff.org/deeplinks/2025/12/effs-investigations-expose-flock-safetys-surveillance-abuses-2025-review.

[18] *See* Flock Safety, Flock Evidence Policy, https://www.flocksafety.com/legal/flock-evidence-policy; Flock Safety, License Plate Reader Policy, https://www.flocksafety.com/legal/lpr-policy; Flock Safety, Privacy Policy, https://www.flocksafety.com/legal/privacy-policy; Flock Safety, FlockOS, https://www.flocksafety.com/products/flock-os.

**Count 1**
**Infringement of U.S. Patent No. 12,375,342**

117. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

118. Plaintiff is the owner by assignment of the ‘342 patent, entitled “Correlation engine for correlating sensory events.” The ‘342 patent was duly and legally issued by the United States Patent and Trademark Office on July 29, 2025.

119. Defendant has offered for sale, sold, and/or imported in the United States Accused Products that directly or indirectly infringe the ‘342 patent since its issuance. Defendant has directly infringed and continues to infringe the ‘342 patent, for example, by making, using, selling, offering for sale, and/or importing the Accused Products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses the Accused Products while providing technical support to its customers.

120. Claims 12, 17, and 20 recite:

> 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> > a receiver to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprise at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected;
> >
> > an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events; and
> >
> > a correlation engine to evaluate one or more historical correlations among the stored sensory events, wherein the correlation engine evaluates the stored sensory events for the one or more historical correlations across at

least one of time and space based on at least weighting of the stored sensory events, and wherein the stored sensory events are weighted based at least on one or more attribute data associated with the sensory data.

12. The non-transitory, physical storage medium of claim 1, wherein the storage medium further comprises program code, which when executed causes the hardware processor to:

receive tip data from one or more external sources; generate tip events based on the tip data; correlate one or more tip events with the sensory events; and generate one or more alerts based on the correlation between the tip events and the sensory events.

17. The non-transitory, physical storage medium of claim 1, further comprising program code to implement:

a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events.

20. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to:

receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprise at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected;

store the sensory events for later retrieval as stored sensory events;

evaluate one or more historical correlations among the stored sensory events, by evaluating the stored sensory events for the one or more historical correlations across at least one of time and space based on at least weighting of the stored sensory events; and

store data from the one or more sensors utilizing a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events.

121. Non-limiting examples of Defendant's infringement of claims 12, 17, and 20 of the '342 patent include the Flock System described above, including its Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS®, Enhanced LPR software, Flock Safety Platform, Raven® audio detection device, and related cloud services, as detailed *supra* in the Flock Product Offerings.

122. The Falcon® LPR cameras are IP-connected, LTE-enabled, motion-activated cameras that capture video and other sensory data concerning a physical environment and use Vehicle Fingerprint® technology and on-device machine processing to detect vehicles and license plates.

123. Flock stores detected sensory events in cloud storage for later retrieval through the Flock Safety Platform and maintains timestamped event and classification metadata associated with those events.

124. Vehicle Fingerprint® applies confidence-based scoring to the detected vehicle and license-plate events, using attribute-based weighting and trait-specific thresholds for attributes such as make, color, body type, racks, stickers, tool boxes, and times seen.

125. Enhanced LPR evaluates stored events for historical correlations across time and space, including through Multi-Geo Search and Convoy Search.

126. With respect to claim 12, the Flock System receives tip data from external sources, including custom hotlist entries, BOLOs, and incident data shared by other agencies. On information and belief, when a vehicle plate or description is entered into a Custom Hot List or BOLO, the system generates a structured tip-event record that is matched against future sensory events. When a match occurs, the system generates a real-time alert.

127. The Flock System implements hierarchical storage across on-device temporary storage and AWS cloud storage, with an event-driven cascade and automated retention and deletion rules.

128. Plaintiff has been and continues to be injured by Defendant's infringement of the '342 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

129. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 2**
**Infringement of U.S. Patent No. 11,323,314**

130. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

131. Plaintiff is the owner by assignment of the '314 patent, entitled "Hierarchical data storage and correlation system for correlating and storing sensory events in a security and safety system." The '314 patent was duly and legally issued by the United States Patent and Trademark Office on May 3, 2022.

132. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '314 patent. Defendant has directly and indirectly infringed and continues to infringe the '314 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United

States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant's customers.

133. Claims 13 and 21 recite:

> 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> > receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object;
> >
> > a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events; an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;
> >
> > a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space, wherein the correlation module is adapted to monitor the received sensory events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations; and
> >
> > an alerting module to send one or more alerts based on the one or more critical events, wherein communication between the sensory event analytics module, the hierarchical storage manager, the correlation module, and the alerting module occurs over an IP network.
>
> 13. The non-transitory, physical storage medium of claim 1, wherein the sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.
>
> 21. A system comprising:

a hardware processor; and

a non-transitory, physical storage medium storing computer-readable program code, the program code executable by the hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:

a receiver to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object;

a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events;

an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;

a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space, wherein the correlation module is adapted to monitor the received sensory events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations; and

an alerting module to send one or more alerts based on the one or more critical events, wherein communication between the sensory event analytics module, the hierarchical storage manager, the correlation module, and the alerting module occurs over an IP network.

134. Non-limiting examples of Defendant's infringement of claims 13 and 21 of the '314 patent include the Flock System described above, including its Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS®, Enhanced LPR software, Flock Safety Platform, Raven® audio detection device, and related cloud services.

135. The Falcon® cameras capture sensory data concerning a physical environment and process that data to detect sensory events, including vehicles and license plates, using Vehicle Fingerprint® technology and on-device machine processing.

136. Flock also uses the Raven® audio detection device to detect gunshot events from environmental sound data and integrates LPR, video, and audio data in FlockOS®.

137. The Flock System stores detected events for later retrieval and maintains timestamped event and classification metadata. It applies sensor-specific attributes, including Vehicle Fingerprint® confidence scoring and trait-specific thresholds, in processing detected events.

138. Enhanced LPR evaluates stored event records for historical correlations across time and space, including through Multi-Geo Search and Convoy Search.

139. FlockOS® provides real-time alerts, BOLOs, and cross-jurisdictional sharing, and generates alerts when matches are detected.

140. Communication among the Falcon® cameras, FlockOS®, the Flock Safety Platform, and the cloud occurs over IP networks, including through LTE-connected cameras.

141. The Flock System implements hierarchical storage management across on-device temporary storage, AWS cloud storage, and AWS GovCloud through an event-driven cascade and automated retention and deletion rules.

142. Plaintiff has been and continues to be injured by Defendant's infringement of the '314 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

143. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was

sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 3**
**Infringement of U.S. Patent No. 9,344,616**

144. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

145. Plaintiff is the owner by assignment of the '616 patent, entitled "Correlation engine for security, safety, and business productivity." The '616 patent was duly and legally issued by the United States Patent and Trademark Office on May 17, 2016.

146. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '616 patent. Defendant has directly and indirectly infringed and continues to infringe the '616 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant's customers.

147. Claim 48 recites:

> 39. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising:
>
> > receiving sensory data about a physical environment from one or more sensors;
> >
> > receiving IP data of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors;
> >
> > processing the sensory data from the one or more sensors to detect one or more primitive sensory events;
> >
> > normalizing the primitive sensory events into a standardized data format;

> storing the normalized sensory events in an event database for later retrieval;
>
> retrieving one or more historical normalized sensory events from the event database;
>
> evaluating one or more historical correlations by automatically analyzing said primitive sensory events, across at least one of time and space, for one or more historical correlations among the historical normalized sensory events;
>
> monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events;
>
> monitoring continuously and in real-time the network status of one or more of the sensors based on the IP data to identify one or more network failure events;
>
> sending one or more alerts based on at least one of said critical events and said network failure events.

> 48. The non-transitory, physical storage medium of claim 39, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

148. Non-limiting examples of Defendant's infringement of claim 48 of the '616 patent include the Flock System described above, including its Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS®, Enhanced LPR software, Flock Safety Platform, Raven® audio detection device, and related cloud services.

149. Flock's Falcon® cameras detect motion, generate real-time notifications and vehicle events, and use Vehicle Fingerprint® technology to classify vehicles and license plates, as detailed *supra* in the Flock Product Offerings.

150. Flock receives and processes IP and network-status information from its LTE-connected cameras, including camera connectivity and health-check information.

151. Flock stores detected events in cloud storage for later retrieval and maintains timestamped event and classification metadata associated with those events.

152. Vehicle Fingerprint® and FlockOS® normalize sensory information into a standardized, searchable format used for vehicle, license-plate, and related event searches.

153. Enhanced LPR retrieves stored events and evaluates historical correlations across time and space, including through Multi-Geo Search and Convoy Search.

154. FlockOS® continuously monitors sensory events in real time, generates alerts when hotlist matches are detected, and monitors network status and device health.

155. Vehicle Fingerprint® confidence scoring weights primitive sensory events based on sensor and image attributes, using trait-specific thresholds to calculate confidence in the classifications and matches.

156. Plaintiff has been and continues to be injured by Defendant's infringement of the '616 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

157. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 4**
**Infringement of U.S. Patent No. 11,929,870**

158. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

159. Plaintiff is the owner by assignment of the '870 patent, entitled "Correlation engine for correlating sensory events." The '870 patent was duly and legally issued by the United States Patent and Trademark Office on March 12, 2024.

160. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '870 patent. Defendant has directly and indirectly infringed and continues to infringe the '870 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant's customers.

161. Claims 1, 12, and 20 recite:

> 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> > a receiver module to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected;
> >
> > an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;
> >
> > a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based at least on weighting of the stored sensory events, and wherein the stored sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.
>
> 12. The non-transitory, physical storage medium of claim 1, wherein the storage medium further comprises program code, which when executed causes the hardware processor to:
>
> > receive tip data from one or more external sources; generate tip events based on the tip data;

correlate one or more tip events with the sensory events; and
generate one or more alerts based on the correlation between the tip events and the sensory events.

20. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:

an receiver module to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected;

an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;

a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based at least on weighting of the stored sensory events; and

a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, and wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events.

162. Non-limiting examples of Defendant's infringement of claims 1, 12, and 20 of the '870 patent include the Flock System described above, including its Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS®, Enhanced LPR software, Flock Safety Platform, Raven® audio detection device, and related cloud services.

163. With respect to claim 12, the Flock System receives tip data from external sources, including custom hotlist entries, BOLOs, and incident data shared by other agencies. On information and belief, when a vehicle plate or description is entered into a Custom Hot List or

BOLO, the system generates a structured tip-event record that is matched against future sensory events. When a match occurs, the system generates a real-time alert.

164. The Falcon® cameras detect and classify sensory events; the Flock System stores timestamped event records; Vehicle Fingerprint® confidence-based scoring weights the events using sensor and image attributes; and Enhanced LPR evaluates stored events across time and space, as detailed *supra* in the Flock Product Offerings.

165. The Flock System implements hierarchical storage with event-driven and rules-driven cascade from on-device temporary storage to AWS cloud storage, with a 30-day rolling retention default and automated retention and deletion rules.

166. Plaintiff has been and continues to be injured by Defendant's infringement of the '870 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

167. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 5**
**Infringement of U.S. Patent No. 9,619,984**

168. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

169. Plaintiff is the owner by assignment of the '984 patent, entitled "Systems and methods for correlating data from IP sensor networks for security, safety, and business productivity

applications." The '984 patent was duly and legally issued by the United States Patent and Trademark Office on April 11, 2017.

170. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '984 patent. Defendant has directly and indirectly infringed and continues to infringe the '984 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant's customers.

171. Claim 10 recites:

> 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising:
>
> > receiving sensory data about a physical environment from one or more sensors;
> >
> > receiving IP data of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors;
> >
> > processing the sensory data from the one or more sensors to detect one or more primitive sensory events;
> >
> > normalizing the primitive sensory events into a standardized data format;
> >
> > storing the normalized sensory events in an event database for later retrieval;
> >
> > retrieving one or more stored sensory events from the event database;
> >
> > evaluating one or more historical correlations by automatically analyzing said stored sensory events, across at least one of time and space, for one or more historical correlations among the stored sensory events;
> >
> > monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events; monitoring continuously and in real-time the network status of one or more of the

sensors based on the IP data to identify one or more network failure events; and

sending one or more alerts based on at least one of said critical events and said network failure events.

10. The monitoring system of claim 1, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

172. Non-limiting examples of Defendant's infringement of claim 10 of the '984 patent include the Flock System described above, including its Falcon® LPR cameras, Vehicle Fingerprint® technology, FlockOS®, Enhanced LPR software, Flock Safety Platform, Raven® audio detection device, and related cloud services.

173. Flock receives sensory data from Falcon® cameras and processes it through Vehicle Fingerprint® technology to detect vehicles and license plates.

174. Flock demonstrates motion detection, real-time notifications, and vehicle monitoring through Falcon® cameras, FlockOS®, and the Flock Safety Platform.

175. Flock receives IP and network-status information from its LTE-connected cameras and performs connectivity and device-health checks.

176. Flock stores detected events for later retrieval through its cloud platform and maintains timestamped event and classification metadata.

177. Camera data is encrypted in transit using TLS 1.2 or later and at rest using AES-256; Criminal Justice Information Services (CJIS) data is stored in AWS GovCloud.

178. Vehicle Fingerprint® and FlockOS® normalize sensory information into standardized, searchable records for vehicle, license-plate, and related event searches.

179. Enhanced LPR retrieves stored events and evaluates historical correlations across time and space, including through Multi-Geo Search and Convoy Search.

180. FlockOS® continuously monitors sensory events and generates real-time notifications and alerts, including alerts triggered by matches to hotlists and other configured criteria.

181. Flock monitors network status and device health and uses Vehicle Fingerprint® confidence scoring to weight events based on sensor and image attributes, applying trait-specific thresholds in event processing.

182. Plaintiff has been and continues to be injured by Defendant's infringement of the '984 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

183. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 6**
**Infringement of U.S. Patent No. 10,587,460**

184. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

185. Plaintiff is the owner by assignment of the '460 patent, entitled "Systems and Methods for Correlating Sensory Events and Legacy System Events Utilizing a Correlation Engine for Security, Safety, and Business Productivity." The '460 patent was duly and legally issued by the United States Patent and Trademark Office on March 10, 2020.

186. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '460 patent. Defendant has directly and indirectly

infringed and continues to infringe the ‘460 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant’s customers.

187. Claims 11, 13, and 14 recite:

> 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> > a primitive event analytics module adapted to receive sensory data about a physical environment from one or more sensors and for processing the sensory data from the one or more sensors to detect one or more primitive sensory events;
> >
> > a legacy event analytics module adapted to receive legacy system data from one or more legacy systems and for processing the legacy system data from the one or more legacy systems to detect one or more primitive legacy events;
> >
> > a network analytics module adapted to receive Internet Protocol (IP) data of the one or more sensors, wherein the IP data comprises at least an IP address and network status of at least one of the sensors, and wherein the network analytics module is adapted to process the IP data of the one or more sensors to detect one or more primitive network events;
> >
> > a normalization engine adapted to normalize the primitive sensory events, the primitive legacy events, and the primitive network events into a standardized data format to generate normalized sensory events, normalized legacy events, and normalized network events;
> >
> > an event queue adapted to queue the normalized sensory events, the normalized legacy events, and the normalized network events for storage in an event database and for later retrieval as stored sensory events, stored legacy events, and stored network events from the event database;
> >
> > a correlation engine adapted to evaluate one or more historical correlations by automatically analyzing said stored sensory events, said stored legacy events, and said stored network events, across at least one of time and space, for one or more historical correlations among the stored sensory events, the stored legacy events, and the stored network events, wherein the correlation

> engine is adapted to monitor continuously and in real-time the normalized sensory events, the normalized legacy events, and the normalized network events to identify one or more critical events;
>
> an alerting engine adapted to send one or more alerts based on said one or more critical events, wherein said one or more critical events are based at least on the one or more historical correlations among said stored sensory events, said stored legacy events, and said stored network events.

> 11. The monitoring system of claim 1, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.
>
> 13. The monitoring system of claim 11, wherein the attribute data comprises an age of the sensors used to capture the sensory data.
>
> 14. The monitoring system of claim 11, wherein the attribute data comprises a time since the sensors were last maintained.

188. Non-limiting examples of Defendant's infringement of claims 11, 13, and 14 of the '460 patent include the Flock System described above, including IP video camera analytics and sensory data processing, integration with legacy systems and IP network monitoring, normalization and storage of events for later retrieval, correlation of stored events across time and space, sending of alerts based on critical events, and weighting of primitive sensory events based on sensor attribute data including sensor age and maintenance history.

189. FlockOS® provides legacy event analytics by integrating with the National Crime Information Center (NCIC), computer-aided dispatch (CAD), records-management systems (RMS), drone-as-first-responder (DFR) systems, 911, gunshot-detection systems, and custom hotlists. FlockOS® receives and processes data from those legacy systems to detect legacy events and correlates those legacy events with sensory events in the Flock System.

190. The Flock System implements network analytics through its LTE-connected cameras, which communicate over IP networks, and through health checks that monitor camera

and device status. The system processes connectivity and device-health information as network data for monitoring and alerting.

191. With respect to claim 13, on information and belief, Flock software measures camera performance and uses camera-related information, including operational age and performance characteristics, when evaluating the significance of sensory events.

192. With respect to claim 14, on information and belief, Flock software diagnoses camera and device issues, records or evaluates maintenance-related information, and schedules maintenance based on camera performance and device health.

193. Plaintiff has been and continues to be injured by Defendant's infringement of the '460 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

194. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 7**
**Infringement of U.S. Patent No. 10,862,744**

195. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

196. Plaintiff is the owner by assignment of the '744 patent, entitled "Correlation System for Correlating Sensory Events and Legacy System Events." The '744 patent was duly and legally issued by the United States Patent and Trademark Office on December 8, 2020.

197. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringe the '744 patent. Defendant has directly and indirectly infringed and continues to infringe the '744 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Delaware. In addition, on information and belief, Defendant uses them while providing technical support to Defendant's customers.

198. Claims 16 and 26 recite:

> 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> > a sensory event analytics module to receive sensory data about a physical environment from one or more sensors and to process the sensory data from the one or more sensors to detect one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events is selected from the group consisting of a person detected, a face detected, a vehicle detected, and a license plate detected;
> >
> > a legacy event analytics module adapted to receive legacy system data from one or more legacy systems and to process the legacy system data from the one or more legacy systems to detect one or more legacy events, wherein the one or more legacy systems is selected from the group consisting of an access control system, a personnel system, a license plate system, an inventory system, a law enforcement system, and a lighting system;
> >
> > an event queue having access to an event database to store the sensory events and the legacy events for later retrieval as stored sensory events and stored legacy events;
> >
> > a correlation module to calculate one or more historical correlations by automatically analyzing the stored sensory events and the stored legacy events across at least one of time and space, wherein the correlation module is adapted to monitor continuously and in real-time the sensory events and the legacy events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations among the stored sensory events and the stored legacy events;

> an alerting module to send one or more alerts based on the one or more critical events.
>
> 16. The monitoring system of claim 1, wherein the sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.
>
> 25. The monitoring system of claim 1, further comprising program code to implement:
>
> > a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors.
>
> 26. The monitoring system of claim 25, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events.

199. Non-limiting examples of Defendant's infringement of claims 16 and 26 of the '744 patent include the Flock System described above. FlockOS® provides legacy event analytics by integrating with the National Crime Information Center (NCIC), computer-aided dispatch (CAD), records-management systems (RMS), drone-as-first-responder (DFR) systems, and 911 systems, including a license plate system and law enforcement systems. FlockOS® processes data from those systems to detect legacy events and correlates those legacy events with sensory events.

200. The Flock System implements a hierarchical storage manager through a three-tier storage architecture comprising (1) temporary storage on the camera, (2) AWS cloud storage, and (3) AWS GovCloud storage for Criminal Justice Information Services (CJIS) data. On information and belief, the system uses an event-driven cascade to move, retain, classify, and delete camera data across those tiers based on sensory events and related operational rules.

201. Plaintiff has been and continues to be injured by Defendant's infringement of the '744 patent. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's infringement.

202. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Count 8**
**Induced Infringement of the Asserted Patents Under 35 U.S.C. § 271(b)**

203. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

204. Defendant has actively induced, and continues to actively induce third parties and its customers, resellers, distributors, integrators, and business partners, to directly infringe the Asserted Patents, in violation of 35 U.S.C. § 271(b).

205. Defendant has had knowledge of at least some of the Asserted Patents at least as of January 27, 2026, when it received a letter addressed to Dan Haley, Flock's Chief Legal Officer, regarding the Asserted Patents. Despite this knowledge, Defendant has continued to encourage and facilitate infringement by third parties.

206. Defendant induces infringement by, among other things: (a) providing product documentation, deployment guidance, tutorials, and application interfaces instructing Flock customers how to configure and deploy the Accused Products in configurations that practice the Asserted Claims; (b) providing technical support and services that assist customers in building and operating infringing systems; (c) marketing and selling the Accused Products as an integrated platform designed to be deployed in the configurations described in the Asserted Claims; and (d) providing instructions for integrating Falcon® cameras, FlockOS®, the Flock Safety Platform,

Enhanced LPR, and Raven® to generate security events, alerts, searchable evidence, and automated investigative actions.

207. Defendant also affirmatively encourages customers and participating agencies to integrate the Accused Products through FlockOS®'s integration approach. FlockOS® integrates data from CAD, RMS, DFR, 911, and gunshot-detection systems; supports cross-jurisdictional collaboration by sharing live alerts and BOLOs; and integrates with NCIC, NCMEC, AMBER Alert, custom hotlists, and third-party platforms. The Flock Safety Platform and FlockOS® thereby permit customers to combine LPR, video, audio, sensor, dispatch, records, and alert data in coordinated investigative workflows.

208. FlockOS® integrates the Flock System with CAD, RMS, DFR, 911, and gunshot-detection systems, and supports cross-jurisdictional collaboration by sharing live alerts and BOLOs. It also integrates with NCIC, NCMEC, AMBER Alert, and custom hotlists so that matches can generate real-time alerts.

209. Through these integrations and third-party platform interfaces, Flock customers and participating agencies can combine Falcon® camera, Vehicle Fingerprint®, Raven®, and other sensor events with dispatch, records, hotlist, and investigative data to create coordinated, automated workflows.

210. Defendant provides software interfaces, account-linking functionality, integration support, product compatibility, and setup instructions that allow customers and participating agencies to combine Flock LPR, video, audio, sensor, dispatch, records, and third-party platform data in automated systems. On information and belief, customers following those instructions operate Flock configurations in which Flock-generated sensory events and device-status information are evaluated with other event data, hotlist matches, temporal and geographic

information, and configured rules to perform responsive alerts, security, investigative, and other actions.

211. Defendant possesses the specific intent to induce infringement. After receiving notice of the Asserted Patents and the infringement allegations in this Action, Defendant continued to provide and maintain instructions directing customers and participating agencies to connect Falcon® cameras, FlockOS®, the Flock Safety Platform, Enhanced LPR, Raven®, and related interfaces to CAD, RMS, DFR, 911, gunshot-detection systems, NCIC, NCMEC, AMBER Alert, custom hotlists, cross-jurisdictional sharing, and third-party platforms, and to create coordinated configurations of the type described above. Those instructions, software interfaces, integration support, interoperability features, and technical assistance are affirmative conduct encouraging customers and other third parties to use the Accused Products in infringing configurations despite Defendant's knowledge of the Asserted Patents.

212. Plaintiff has been and continues to be injured by Defendant's induced infringement of the Asserted Patents. Plaintiff is entitled to recover damages sufficient to compensate for Defendant's induced infringement.

213. Defendant's infringement is willful. Defendant has had knowledge of at least some of the Asserted Patents and their infringement at least as of January 27, 2026, when a letter was sent to Dan Haley, Flock's Chief Legal Officer, with actual notice of infringement of one or more of the Asserted Patents pursuant to 35 U.S.C. §287(a). Despite that knowledge, Defendant has continued to make, use, sell, offer for sale, and import the Accused Products.

**Prayer for Relief**

WHEREFORE, Plaintiff SecureNet Solutions Group, LLC respectfully requests that this Court enter:

A. A judgment in favor of Plaintiff that Defendant has infringed, either literally and/or under the doctrine of equivalents, and either directly or indirectly, U.S. Patent Nos. 12,375,342; 11,323,314; 9,344,616; 11,929,870; 9,619,984; 10,587,460; and 10,862,744.

B. A judgment and order requiring Defendant to pay Plaintiff its damages, costs, and expenses for its infringement of the Asserted Patents, as provided under 35 U.S.C. § 284;

C. A judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, prejudgment and post-judgment interest;

D. A judgment and order finding that Defendant's infringement was willful and an award of enhanced damages pursuant to 35 U.S.C. § 284;

E. A judgment and order finding that this is an exceptional case under 35 U.S.C. § 285 and an award of Plaintiff's reasonable attorneys' fees;

F. A post-verdict accounting; and

G. Any and all other relief as the Court may deem appropriate and just under the circumstances.

## Demand for Jury Trial

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury of any issues so triable by right.

Respectfully submitted,

Dated: September 10, 2026

*<u>/s/ John C. Phillips, Jr.</u>*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

*Of Counsel:*

Vandana S. Koelsch (*pro hac vice* to be filed)
MICHAEL BEST & FRIEDRICH LLP
675 15th Street, Suite 2000
Denver, CO 80202
(720) 240-9515
vandana.koelsch@michaelbest.com

Albert Bianchi, Jr. (*pro hac vice* to be filed)
MICHAEL BEST & FRIEDRICH LLP
1 S Pinckney St., Unit 700
Madison, WI 53703
(608) 257-3501
AJ.Bianchi@michaelbest.com

*Attorneys for Plaintiff*